## IN THE CIRCUIT COURT OF CRITTENDEN COUNTY, ARKANSAS

**WALTER DWAYNE RAMSEY,**
**Administrator of the Estate of**
**NORMA LOUISE RAMSEY, deceased,**
**WALTER DWAYNE RAMSEY,**
**WANDA GRACE RAMSEY, and**
**JOYCE ANN WESTFALL,**

3:09CV00035-JMM

     **PLAINTIFFS,**

**V.**

NO. *CV 2009-153*

**BEVERLY ENTERPRISES, INC.,**
**BEVERLY HEALTH AND**
**REHABILTIATION SERVICES, INC.**
**and BEVERLY ENTERPRISES – ARKANSAS, INC.**
**d/b/a BEVERLY HEALTHCARE – WEST MEMPHIS,**
**FILLMORE CAPITAL PARTNERS, LLC, FILLMORE**
**STRATEGIC INVESTORS, LLC,**
**PEARL SENIOR CARE, INC., PSC SUB, INC.,**
**GEARY PROPERTY HOLDINGS, LLC,**
**WILLIAM R. FLOYD, DOUGLAS J. BABB,**
**DAVID R. DEVEREAUX, JEFFERY P. FREIMARK,**
**CINDY H. SUSIENKA, PATRICE K. ACOSTA,**
**JAMES M. GRIFFITH, PATRICIA C. KOLLING,**
**RICHARD SKELLY, JR., RUBIN SCHRON, and**
**BEVERLY INDEMNITY, LTD.**

FILED
2009 MAR -3 PM 3: 51
DONNA PALMER
CIRCUIT COURT CLERK
CRITTENDEN COUNTY AR

     **DEFENDANTS.**

### COMPLAINT

     Plaintiffs, Walter Dwayne Ramsey, Administrator of the Estate of Norma Louise Ramsey, Walter Dwayne Ramsey, Wanda Grace Ramsey, and Joyce Ann Westfall, and state:

# I.

## THE PARTIES, JURISDICTION, AND VENUE

1.0     Plaintiff, Walter Dwayne Ramsey, is a resident and citizen of Crittenden County, Arkansas and is the duly appointed Administrator of the Estate of Norma Louise Ramsey, deceased.  Plaintiff was appointed on September 15, 2004 by the Circuit Court of Crittenden County, Arkansas, Probate Division, Docket No. PR-2004-215 and brings this action for his benefit and the benefit of the decedent's estate and on behalf of others similarly situated to Plaintiff, Plaintiff's decedent, and Plaintiff's decedent's estate.

1.1     Plaintiff, Walter Dwayne Ramsey, brings this action for violation of Ark. Code. Ann. §4-59-201, *et seq.*  He is a resident of Crittenden County, Arkansas.

1.2     Plaintiff, Wanda Grace Ramsey, is a resident and citizen of Crittenden County, Arkansas and brings this action for violation of Ark. Code. Ann. §4-59-201, *et seq.*

1.3     Plaintiff, Joyce Ann Westfall, is a resident and citizen of Pulaski County, Arkansas and brings this action for violation of Ark. Code. Ann. §4-59-201, *et seq.*

1.4     Defendant, Beverly Enterprises, Inc., is a Delaware corporation, having its principal place of business in the State of Arkansas and domiciled in Arkansas.  At all time material to this action, Beverly Enterprises, Inc. was engaged in the business of for-profit custodial care of elderly and infirm nursing home residents and was the parent corporation and alter ego of its wholly owned subsidiaries, Defendant, Beverly Health and Rehabilitation Services, Inc., and Defendant Beverly – Arkansas, Inc., d/b/a Beverly Healthcare – West Memphis.  The agent for service of process for Beverly Enterprises, Inc. is the Corporation Services Company, 120 East Fourth Street, Little Rock, Arkansas 72201.

2

1.5     Defendant, Beverly Health and Rehabilitation Services, Inc., is a California corporation, with its principal place of business in the State of Arkansas and domiciled in Arkansas. At all times material to this action, Beverly Health and Rehabilitation Services, Inc. was a corporation authorized to do business in the State of Arkansas and was doing business as a nursing home management company and provided services with and for Beverly Healthcare – West Memphis. The agent for service of process for Beverly Health and Rehabilitation Services, Inc. is the Corporation Services Company, 120 East Fourth Street, Little Rock, Arkansas 72201.

1.6     Defendant Beverly Enterprises – Arkansas, Inc. d/b/a Beverly Healthcare – West Memphis was a California corporation, having its principal place of business in the State of Arkansas and domiciled in Arkansas. At all times material to this action, Beverly Healthcare – West Memphis was the licensee and was authorized to do business in Arkansas and to operate a nursing home. The agent for service of process for Beverly Healthcare – West Memphis is the Corporation Service Company, 120 East Fourth Street, Little Rock, Arkansas 72201. Beverly Healthcare – West Memphis was and remains a proprietary corporation engaged in the for-profit custodial care of elderly, helpless individuals who are chronically infirm, mentally impaired, and in need of nursing care and treatment.

1.7     Beverly Indemnity, LTD is a Vermont Corporation domiciled in Arkansas with its principal place of business in Arkansas at 1000 Beverly Way, Fort Smith, Arkansas 72919. Beverly Indemnity's Agent for service of process is the Corporation Service Company, 159 State Street, Montpelier, Vermont 05602.

1.8     The Defendants identified in Paragraphs 1.5 to 1.7 are hereinafter referred to collectively as "Beverly Defendants."

3

1.9     Fillmore Capital Partners, LLC (Fillmore Partners) is a Delaware limited liability company with its principal executive office at 140 Pacific Avenue, San Francisco, California 94111. The agent for service of process for Fillmore Partners is the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808. Fillmore Partners owns the shell entities that have been created solely for the purpose of purchasing Beverly. Fillmore Partners made the offer to purchase Beverly and requested an assignment of the merger agreement between Beverly and North American Senior Care. Fillmore Partners knew and intended to engage into a merger with a company, Beverly, that is domiciled and headquartered in Arkansas. Fillmore Partners and its alter ego companies may maintain the headquarters of Beverly in Fort Smith, Arkansas, post-merger. The official meeting of Beverly shareholders approving this Fillmore Partners's merger with Beverly took place in Fort Smith, Arkansas on February 14, 2006. The CEO/President of Fillmore and its subsidiaries, Ronald Silva, has been in Arkansas many times, to include a closed door meeting that took place in Fort Smith, Arkansas on February 16, 2005. At this meeting, Mr. Silva met with various business and anti-consumer groups to devise a strategy that would eliminate the ability for victims of substandard care in Beverly nursing homes to hold Beverly accountable. Ronald Silva was quoted in a newspaper article on February 10 about his plans for the meeting. "What we need to do is stop being attached. And if that can't happen, we'll pick up our toys and move on."

1.10    Fillmore Strategic Investors, LLC (Fillmore Investors) is a Delaware limited liability company with its principal executive office at 140 Pacific Avenue, San Francisco, California 94111.   The agent for service of process for Fillmore Strategic Investors is the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.  Beverly announced on November 21, 2005 that Fillmore Investors, an affiliate of

4

Fillmore Capital Partners, would replace NASC as Beverly's acquiring party. Fillmore Investors made equity contribution so that the other Fillmore entities could complete the Fillmore merger with Beverly. Fillmore Investors knew and intended to engage into a merger with a company, Beverly, that is domiciled and headquartered in Arkansas. Fillmore Investors and its alter ego companies may maintain the headquarters of Beverly in Fort Smith, Arkansas, post-merger. The official meeting of Beverly shareholders approving the Fillmore Investors merger with Beverly took place in Fort Smith, Arkansas on February 14, 2006. The CEO/President of Fillmore and its subsidiaries, Ronald Silva, has been in Arkansas many times, to include a closed door meeting that took place in Fort Smith, Arkansas on February 16, 2005. At this meeting, Mr. Silva met with various business and anti-consumer groups to devise a strategy that would eliminate the ability for victims of substandard care in Beverly nursing homes to hold Beverly accountable. Ronald Silva was quoted in a newspaper article on February 10 about his plans for the meeting. "What we need to do is stop being attached. And if that can't happen, we'll pick up our toys and move on."

     1.11  Pearl Senior Care, Inc. ("PSC") is a Delaware corporation with its principal executive office at 140 Pacific Avenue, San Francisco, California 94111. The agent for service of process for PSC is Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. PSC is a wholly owned indirect subsidiary of Fillmore Capital Partners. PSC is a shell corporation formed solely for the purpose of entering a merger agreement with Beverly and consummating the transactions contemplated by the merger agreement. PSC knew and intended to engage into a merger with a company, Beverly, that is domiciled and headquartered in Arkansas. PSC and its alter ego companies may maintain the headquarters of Beverly in Fort Smith, Arkansas, post-merger. The official meeting of Beverly

shareholders approving the PSC merger with Beverly took place in Fort Smith, Arkansas on February 14, 2006. The CEO/President of Fillmore and its subsidiaries, Ronald Silva, has been in Arkansas many times, to include a closed door meeting that took place in Fort Smith, Arkansas on February 16, 2005. At this meeting, Mr. Silva met with various business and anti-consumer groups to devise a strategy that would eliminate the ability for victims of substandard care in Beverly nursing homes to hold Beverly accountable. Ronald Silva was quoted in a newspaper article on February 10 about his plans for the meeting. "What we need to do is stop being attached. And if that can't happen, we'll pick up our toys and move on."

    1.12    PSC Sub, Inc. (PSC Sub) is a Delaware corporation and a wholly owned subsidiary of PSC. PSC Sub's principal executive offices are located at 140 Pacific Avenue, San Francisco, California 94111. The agent for service of process for PSC Sub is Corporation Trust Company, Corporation Trust Center, 140 Pacific Avenue, San Francisco, California 19801. PSC Sub is a shell corporation organized solely for the purpose of entering into the merger agreement with Beverly and consummating the transactions contemplated by the merger agreement. Under the terms of the merger agreement, PSC Sub will merge with and into Beverly. Beverly will survive the merger, and PSC Sub will cease to exist. All of BEI's stock will be owned by PSC. PSC Sub knew and intended to engage into a merger with a company, Beverly, that is domiciled and headquartered in Arkansas. PSC Sub and its alter ego companies may maintain the headquarters of Beverly in Fort Smith, Arkansas, post-merger. The official meeting of Beverly shareholders approving the PSC Sub merger with Beverly took place in Fort Smith, Arkansas on February 14, 2006. The CEO/President of Fillmore and its subsidiaries, Ronald Silva, has been in Arkansas many times, to include a closed door meeting that took place in Fort Smith, Arkansas on February 16, 2005. At this meeting, Mr. Silva met with various

business and anti-consumer groups to devise a strategy that would eliminate the ability for victims of substandard care in Beverly nursing homes to hold Beverly accountable. Ronald Silva was quoted in a newspaper article on February 10 about his plans for the meeting. "What we need to do is stop being attached. And if that can't happen, we'll pick up our toys and move on."

1.13    Geary Property Holdings, LLC (GPH) is a Delaware limited liability company and is a wholly owned indirect subsidiary of Fillmore Investors. GPH's principal executive offices are located at 140 Pacific Avenue, San Francisco, California 94111. The agent for service of process for GPH is Corporation Trust Company, Corporation Trust Center, 140 Pacific Avenue, San Francisco, California 19801. GPH is a shell corporation organized solely for the purpose of entering into the merger agreement with BEI and consummating the transactions contemplated by the merger agreement. Under the terms of the merger agreement, GPH will merge with and into BEI. BEI will survive the merger, and GPH will cease to exist. All of BEI's stock will be owned by GPH. GPH knew and intended to engage into a merger with a company, Beverly, that is domiciled and headquartered in Arkansas. GPH and its alter ego companies may maintain the headquarters of Beverly in Fort Smith, Arkansas, post-merger. The official meeting of Beverly shareholders approving the merger took place in Fort Smith, Arkansas on February 14, 2006. The CEO/President of Fillmore and its subsidiaries, Ronald Silva, has been in Arkansas many times, to include a closed door meeting that took place in Fort Smith, Arkansas on February 16, 2005. At this meeting, Mr. Silva met with various business and anti-consumer groups to devise a strategy that would eliminate the ability for victims of substandard care in Beverly nursing homes to hold Beverly accountable. Ronald Silva was quoted in a newspaper article on February 10 about his plans for the meeting. "What we need to do is stop being attached. And if that can't happen, we'll pick up our toys and move on."

7

1.14    The Defendants identified in Paragraph 1.9 to 1.13 are hereinafter referred to collectively as "Fillmore Group."

1.15    William R. Floyd, Chairman, President, and Chief Executive Officer of BEI is an Arkansas resident and may be served at his residence at 1800 Innsbruck Lane, Fort Smith, Arkansas 72908.

1.16    Douglas J. Babb, Executive Vice-President and Chief Legal Officer of BEI is an Arkansas resident and may be served at his residence at 2517 Greenridge Drive, Fort Smith, Arkansas 72903.

1.17    David R. Devereaux, Executive Vice-President and Chief of Operations of Nursing Facilities, is an Arkansas resident and may be served at his residence at 1701 Crestview Lane, Fort Smith, Arkansas 72903.

1.18    Jeffrey P. Freimark, Chief Financial Officer of BEI, is an Arkansas resident and may be served at his residence at 11701 Southcrest Drive, Fort Smith, Arkansas 72916.

1.19    Cindy H. Susienka, Executive Vice-President and Chief of Operations of Aegis and Aseracare, is an Arkansas resident and may be served at her residence at 6607 Woodland Circle, Fort Smith, Arkansas 72916.

1.20    Patrice K. Acosta, Senior Vice-President of BEI, is an Arkansas resident and may be served at her residence at 1701 Crestview Lane, Fort Smith, Arkansas 72903.

1.21    James M. Griffith, Senior Vice-President of BEI, is an Arkansas resident and may be served at his residence at 2829 Spring Mountain Road, Fort Smith, Arkansas 72916.

1.22    Patricia C. Kolling, Senior Vice-President of BEI, is an Arkansas resident and may be served at her residence at 10707 St. Michael Court, Fort Smith, Arkansas 72908.

1.23    Richard Skelly, Jr., Senior Vice-President and Treasurer of BEI, is an Arkansas resident and may be served at his residence at 200 Free Ferry Landing, Fort Smith, Arkansas 72903.

The Defendants identified in Paragraphs 1.15 through 1.23 are hereinafter referred to collectively as "Beverly Executives."

1.24    Rubin Schron is believed to be a New York resident and on information and belief may be served at 1809 East 9th Street, Brooklyn, New York.

1.25    Rubin Schron has agreed to provide the equity financing commitment to GPH. Rubin Schron knew and intended to facilitate a merger with a company, Beverly, that is domiciled and headquartered in Arkansas. Rubin Schron knows that the surviving company may maintain the headquarters of Beverly in Fort Smith, Arkansas, post-merger.  Rubin Schron was previously heavily involved with Beverly's proposed merger to a company known as NASC, a company that publicly stated its intent to maintain its headquarters in Fort Smith, Arkansas. The official meeting of Beverly shareholders approving the merger with Beverly, a merger facilitated by Rubin Schron, took place in Fort Smith, Arkansas on February 14, 2006.

1.26    Jurisdiction and venue are proper in this Court.  Defendants's acts resulted in consequences and damages in Crittenden County, Arkansas.

1.27    The amount of controversy relating to all counts and causes of action forming the basis of this lawsuit, exclusive of interest and costs, is far in excess of any minimum jurisdictional requirements of this Court.

1.28    This action is brought pursuant to the Arkansas Uniform Fraudulent Transfers Act, Arkansas Code Annotated §4-59-201 *et seq*.

1.29    Plaintiffs are "creditors" within the meaning of Arkansas Code Annotated §4-59-201, *et seq*.

1.30    Beverly Enterprises, Inc. and Beverly Enterprises – Arkansas, Inc. are "debtors" within the meaning of Arkansas Code Annotated §4-59-201, *et seq*.

## II.

## CLASS ACTION ALLEGATIONS

2.0    The Plaintiffs are members of a class of persons in the United States and in the State of Arkansas who on account of personal injuries sustained while a resident of a Beverly facility or while visiting a resident of a Beverly facility, are claimants or creditors, within the meaning of Ark. Code Ann. §4-59-201, *et seq*. of Beverly Enterprises, Inc., Beverly Enterprises – Arkansas, Inc., and Beverly Health Rehabilitation Services, Inc. The class is so numerous that joinder of all members is impracticable. There are questions of law or fact common to the class. The claims or defenses of the representative parties are typical of the claims or defenses of the class and the representative parties and their counsel will fairly and adequately protect the interests of the class.

## III.

## FACTUAL ALLEGATIONS AGAINST THE BEVERLY DEFENDANTS

3.0    The Plaintiffs brought suit in Crittenden County, Arkansas on July 7, 2006 in Walter Dwayne Ramsey, Administrator of the Estate of Norma Louise Ramsey, deceased, Walter Dwayne Ramsey, Wanda Grace Ramsey and Joyce Ann Westfall v. Beverly Enterprises, Inc., Beverly Enterprises – Arkansas, Inc., et al, Docket No. CV 2006-350.

3.1    On or about March 14, 2006 to March 31, 2006, Beverly Enterprises, Inc., Beverly Enterprises – Arkansas, Inc., and Beverly Health and Rehabilitation Services, Inc.

10

transferred assets to Pearl Senior Care, Inc., Fillmore Capital Partners, LLC, and Fillmore Strategic Investors, LLC, and to all Beverly Executives.

3.2     The transfer of assets was accomplished by an Agreement and Plan of Merger voted on by the shareholders of Beverly Enterprises, Inc. on February 14, 2006, to be effective March 14, 2006.

3.3     The majority of shares voting for the Agreement and Plan of Merger was owned or controlled by the individual Defendants, William R. Floyd, Douglas J. Babb, David R. Devereaux, Jeffery P. Freimark, Cindy H. Susienka, Patrice K. Acosta, James M. Griffith, Patricia C. Kolling, Richard Skelly, Jr., and Rubin Schron, the Beverly Executives.

3.4     By voting for the Agreement and Plan of Merger, the individual Defendants converted their shares of stock in Beverly Enterprises, Inc. to cash for themselves while transferring assets of the Beverly Defendants to the Fillmore Group that are burdened with debt.

3.5     The transfer has rendered the Beverly Defendants insolvent in that liabilities exceed assets or the Beverly Defendants will be unable to pay judgment creditors when a judgment creditor seeks payment.

3.6     The Defendants intended that the transfer would hinder, delay, or defraud creditors.

3.7     On or about September 9, 2000, Louise Ramsey became a patient, resident, or client at Beverly Healthcare West Memphis, Beverly Enterprises - Arkansas, and was such until July 7, 2004, when she was admitted to Crittenden Memorial Hospital West Memphis, Arkansas.

3.8     During and before December 2003, Mrs. Ramsey contracted a skin rash, which Defendants negligently failed to have treated.

11

3.9     Notwithstanding the infectious nature of scabies from personal contact, Joyce Boatman and the Beverly Enterprises – Arkansas staff failed to inform Mrs. Ramsey's next of kin, Mr. and Mrs. Ramsey and Joyce Westfall, of the Lindane use and their belief that Mrs. Ramsey had a scabies infection, or that other persons at Beverly Enterprises – Arkansas who came in contact with Mrs. Ramsey might have scabies.

3.10    From January 12, 2004 until July 7, 2004, Mrs. Ramsey suffered with a scabies infestation, which went untreated, developed into Norwegian scabies or crusted scabies, which caused a bacterial infection, a systemic inflammatory response, septic shock, and death on July 11, 2004.

3.11    As a result of contact with Louise Ramsey at Beverly Enterprises – Arkansas, Walter Dwayne Ramsey, Wanda Grace Ramsey, and Joyce Ann Westfall contracted scabies.

3.12    Norma Louise Ramsey contracted scabies as a result of contact with Beverly Enterprises – Arkansas employees who provided care and grooming to her as part of the services of the nursing home.

3.13    From August 2003 to July 11, 2004, Beverly had no infection control policies, procedures, and protocols in place and that failure caused or contributed to Mrs. Ramsey's contracting scabies and her death, caused injuries to other similarly situated residents of the Beverly Defendants, and caused injuries to persons visiting residents of the Beverly Defendants.

3.14    The Beverly Defendants were aware of Norma Louise Ramsey's medical condition and the care she required when they represented that they could adequately care for her needs.

3.15    In an effort to ensure that Norma Louise Ramsey and other residents whose care was partially funded by the government were placed at Beverly Healthcare – West Memphis, the

Beverly Defendants held themselves out to the Arkansas Department of Human Services (DHS) and the public at large as being:

        (a)     Skilled in the performance of nursing, rehabilitative, and other medical support services;

        (b)     Properly staffed, supervised, and equipped to meet the total needs of its nursing home residents;

        (c)     Able to specifically meet the total nursing home, medical and physical therapy needs of Norma Louise Ramsey and other residents like her; and

        (d)     Licensed by DHS and complying on a continual basis with all rules, regulations, and standards established for nursing homes.

3.16    The Beverly Defendants failed to discharge their obligations of care to Norma Louise Ramsey and other residents and their visitors, with a conscious disregard for their rights and safety. At all times mentioned herein, the Beverly Defendants, through their corporate officers and administrators, each had knowledge of, ratified and/or otherwise authorized all of the acts or omissions that caused the injuries suffered by Mrs. Ramsey and other residents, and to persons visiting those residents including the hiring and retention of unqualified and untrained nursing staff, as more fully set forth below within each of the respective counts. Defendants knew that this facility was chronically understaffed and that because of the poor staffing levels, the nursing staff could not provide the minimum standard of care to the weak and vulnerable residents of Beverly Healthcare – West Memphis. As a result, the residents deteriorated unnecessarily, and like Mrs. Ramsey, were left to lie in their waste for hours at a time without care or attention. The severity of the recurrent negligence inflicted upon Mrs. Ramsey and other residents while under the care of the Beverly Defendants accelerated the deterioration of their

13

health and physical condition beyond that caused by the normal aging process and resulted in the physical and emotional trauma.

3.17    These injuries were foreseeable to the Beverly Defendants and caused Mrs. Ramsey and other residents to lose personal dignity and to suffer unnecessary pain and suffering, degradation, emotional distress, hospitalization, and death that would have been unnecessary had it not been for the conduct of the Beverly Defendants.

3.18    At all times relevant herein, the Beverly Defendants operated and managed a facility according to a specific plan that would maximize profits by reducing the staffing levels needed to provide care to residents that complied with federal and state regulations governing skilled nursing facilities.  Specifically, the Beverly Defendants intentionally and with knowing and/or reckless disregard for the consequences of their actions caused staffing levels to be set at a level where the personnel on duty at any given time could not reasonably tend to the needs of their respective assigned residents, such as, by way of example only, assisting with feeding, assisting with toileting, and repositioning residents.  Upon information and belief, the Beverly Defendants knowingly established staffing levels that created recklessly high nurse/resident ratios and that disregarded patient acuity levels as well as the minimal time required for such personnel to perform the essential functions of the job.  All of the acts of malfeasance directly affected Mrs. Ramsey and the other residents of Beverly Healthcare – West Memphis, and were known to the Beverly Defendants and their corporate officers as well as employees of the Department of Human Services.

3.19    The Beverly Defendants controlled the operation, planning, management, and quality control of Beverly Healthcare – West Memphis and all other Beverly facilities.  The authority exercised by the Beverly Defendants over the nursing facility included, but was not

14

limited to, budgeting, marketing, human resources management, training, staffing, creation, and implementation of all policy and procedure manuals used by Beverly Healthcare – West Memphis, and all other Beverly facilities, Federal and State reimbursement, quality care, assessment and compliance, licensure and certification, legal services, and financial, tax and accounting control trough fiscal policies established by the Beverly Defendants.

3.20    Upon information and belief, the Beverly Defendants marketed their facility in the community through healthcare providers, including physicians and hospitals, seeking to have residents admitted to the facility who had higher medical and custodial care needs that have previously existed in the population of residents in the Beverly Defendants's chain of nursing homes.

3.21    The Beverly Defendants's acts of increasing the number of high acuity residents contemplated reimbursement schemes by the Medicare and Medicaid programs that were available to residents of Beverly Healthcare – West Memphis and other nursing facilities owned and operated by the Beverly Defendants.

3.22    The Beverly Defendants knew that this increase in the acuity care level of the residents population would substantially increase the need for staff and services, as well as supply, to be provided by the new resident population.

3.23    Plaintiffs allege that on all of the occasions complained of herein, Norma Louise Ramsey and other similarly situated residents of Beverly Defendant facilities, were under the care, supervision, and treatment of the Beverly Defendants and that the injuries complained of herein were proximately caused by the acts and omissions of the Beverly Defendants.

3.24    The Beverly Defendants have vicarious liability for the acts and omissions of all persons or entities under their control, either directly or indirectly, including employees, agents,

15

consultants, independent contractors, whether in-house or outside entities, individuals, agencies, or pools causing or contributing to the injures of Norma Louise Ramsey and other similarly situated residents of Beverly Defendant facilities.

## IV.

### CLAIMS AGAINS BEVERLY DEFENDANTS, BEVERLY EXECUTIVES, FILLMORE CAPITAL PARTNERS, LLC, FILLMORE STRATEGIC INVESTORS, LLC, PEARL SENIOR CARE, INC., PSC SUB, INC., GEARY PROPERTY HOLDINGS, LLC, AND RUBIN SCHRON

### COUNT ONE
### CLAIM FOR VIOLATION OF THE UNIFORM
### FRAUDULENT TRANSFERS ACT
### ARK. CODE ANN. § 4-59-201, et seq.

### FACTS

4.0    In early 2005, near the end of its "three-year strategic plan" BEI announced a potential sale of the company to Formation Capital, LLC. On March 22, 2005 BEI's Board of Directors, led by William Floyd, voted to conduct an auction of the company. In the press release announcing this decision, William Floyd stated that "Our Board, which has overseen the dramatic turnaround we've achieved during the past five years, believe that it is best able to conduct a fair and open auction and to negotiate a transaction that will maximize value for ALL BEI stockholders..." The sale, while it would have maximized the value for all stockholders and William Floyd, would not have been in the best interest of the residents of Beverly's nursing homes.

4.1    On August 17, 2005, BEI announced plans to sell to a company known as North American Senior Care (NASC) in a deal worth $1.9 billion. NASC was set up for the sole purpose of facilitating the sale of BEI. The proposed merger, otherwise known as a leveraged buyout ("LBO"), involved such a high level of debt financing -- in billions of dollars -- that

resulting entity would have had no other choice than to sell or encumber substantially all of BEI's assets, including real property, and likely would have required liquidation of any and all cash reserves.

4.2     The NASC parties were identical to the parties involved in the purchase and sell-off of another large nursing home chain, Mariner.  Mariner was purchased by National Senior Care, Inc. (NSC) in late 2004.  Just as NASC was created for the LBO of Beverly, NSC was a shell company created solely for the purpose of the LBO of Mariner.  The deal required Mariner to sell 170 of its 260 skilled nursing facilities to help finance the debt obligations of the buyout and to allow NSC to purchase Mariner's assets.  The transaction required selling almost $160 million of the company's facilities to pay off the bridge loan.  In other words, Mariner sold substantially all of its assets to finance the deal.  The resulting entity had only minimal value. After the acquisition by NSC, Mariner's unwillingness to pay creditors, lawyers, suppliers and nursing home neglect victims has been well documented.

4.3     NASC failed to meet a financial deadline of November 18, and on November 21, BEI announced that it had agreed to sell to Fillmore Investors for approximately $2.29 billion.

4.4     On December 12, 2005, Beverly filed a proxy statement and announced that, like the Mariner-NSC transaction and Beverly-NASC transaction, various corporate entities were created solely for the purpose of consummating the LBO by Fillmore Investors: PSC, PSC Sub and GPH.  PSC is a wholly owned subsidiary of Fillmore Partners; PSC Sub is a wholly owned subsidiary of PSC, and GPH is an affiliate of Fillmore Partners.  Pearl Senior Care, PSC Sub, GPH, Fillmore Partners and Fillmore Investors are all located at 140 Pacific Avenue, San Francisco, California 94111.

17

4.5     Although Beverly has portrayed Fillmore Partners and its alter ego companies as a completely new buyer that stepped in when the NASC transaction fell through, a closer examination reveals involvement of some of the same pivotal players in not only Beverly's transaction with NASC, but in the Mariner-NSC transaction and even the purchase of another large nursing home chain, Integrated Health Systems (IHS). One familiar person, Rubin Schron, had agreed to provide the equity financing to GPH so that Fillmore can consummate its deal with Beverly. Rubin Schron was not a newcomer to Beverly – he was the lead investor of NASC. Rubin Schron also led the team that acquired Mariner. And in 2003, Rubin Schron purchased 130 nursing homes from IHS. IHS was later sued for not honoring lease agreements and other guarantees. Harry Grunstein, an investor in NASC with his brother Leonard, actually sold Mariner's real estate to Rubin Schron for $850 million. And it was Fillmore Capital Partners that provided Harry Grunstein and Rubin Schron with a $98.6 million loan for the purchase of Mariner. Fillmore actually published this information about its close financial ties and vested interest in Rubin Schron and Harry Grunstein on its website, but shortly after the announcement of Fillmore's acquisition of Beverly, this fact was actually deleted from Fillmore's website. Fillmore also is involved with Sava Senior Care, and entity affiliated with Harry Grunstein that provides services to Mariner facilities.

4.6     Given their past record of failing to honor legal obligations, Fillmore, Grunstein and Schron's involvement with the LBO of BEI, whether by NASC or PSC, raises serious questions about BEI's future ability to pay unsecured creditors like the Estate of Norma Louise Ramsey and others with patient care claims. The LBO of BEI is modeled after the NSC-Mariner LBO that resulted in the liquidation of Mariner to fund the buyout and reduced Mariner's value to between five to twelve million dollars. As explained in a news article, "The only way to make

18

these deals work, especially when the amount of debt for a company triples, is to cut costs and sell assets...this is what happened at both Integrated and Mariner, and at the latter company we hear that the buyer raised $150 million by selling the LTAC division earlier this summer, and that overhead as a percent of revenues has dropped by 20%." In short, the LBO of Mariner left Mariner insolvent and unable to satisfy judgments entered against it. Given the similarities with the Mariner LBO, it is reasonable to infer that the LBO of BEI by Fillmore will leave BEI insolvent, unable to pay its debts as they come due and/or with unreasonably small assets such that it is reasonably foreseeable that BEI will fail.

4.7 Plaintiffs suspect Beverly actually began formulating its arrangement with Fillmore to join this transaction and supplant NASC long before the formal announcement on November 21, 2005. In October 2005, Bill Floyd and Fillmore representatives were observed attending a private invitation-only dinner sponsored by the American Health Care Association. The American Health Care Association is a political action and lobbying group for the nursing home industry. Fillmore has represented that it has never been in the business of long term care, yet representatives were in attendance at an AHCA function.

4.8 The senior executives and directors of BEI received a compensation package of more that $109 million upon completion of the sale. William Floyd received compensation in excess of $43 million; Douglas J. Babb, in excess of $11.8 million; David R. Devereaux, in excess of $10 million; Jeffrey P. Freimark, in excess of $10 million; Cindy H. Susienka, in excess of $9.7 million; Patricia K. Acosta, in excess of $2 million; Pamela H. Daniels, in excess of $2 million; James M. Griffith, in excess of $4.4 million; Patrice C. Kolling, in excess of $1 million; Richard Skelly, Jr., in excess of $1.5 million.

19

4.9     In essence, the same people who formed NASC to purchase Beverly are still present in the new merger with the addition of Fillmore Capital Partners, et al, a company with close ties to the Grunsteins, Rubin Schron and Mariner.

4.10    Beverly, the Defendant executives, Rubin Schron, and the Fillmore Group, just as has been done with the Mariner merger, specifically intend to hamper the ability and cut off any means of recover and compensation for residents who have been injured or killed by substandard care, neglect and even abuse in Beverly nursing homes. One of the Defendant executives, James Griffith (who walks away from the merger with over $4 million) recently admitted as such when commenting about the new legal and operating structure of Beverly post-merger, "That makes it far more difficult for plaintiffs' attorneys to get these extortionate judgments against a nursing home company. And nursing homes have been a wonderful gravy train for the plaintiffs' bar. And they're concerned this gravy train is going to come to a halt." Hidden behind Mr. Griffith's calculated attack on resident advocates lies the truth – Beverly, with the assistance of Rubin Schron, the Fillmore Group, and the executive Defendants, is re-organizing itself with a new legal and operating structure that will make it far more difficult for victims of nursing home neglect and abuse to obtain compensation for harm from Beverly, post-merger.

4.11    Beverly's chief executive, Bill Floyd, has previously made reference to such a "legal and operating structure". In October 2002, Mr. Floyd stated in regard to patient liability, "We are evaluating several strategic alternatives that address this issue..." As discussed herein, the sell off of bad nursing homes was a key component of Beverly's strategic plan. In a conference call on February 20, 2003, Floyd discussed why troubled nursing homes with a history of substandard care would represent an attractive purchase for a potential buyer, "Well, the short answer is that another operator would come in with a totally different set of economic

parameters than the ones we've been facing. First, an important consideration is patient care liability costs. With a change of ownership, the new operator potentially can use a different legal and operating structure to significantly lower his risk profile."

4.12     Floyd mentioned this "legal and operating structure" again. Rather than increase staffing and spend money to correct resident care problems in 18 nursing homes, Beverly announced on June 30, 2003 that it would sell those 18 nursing homes, including Beverly – West Memphis. Floyd stated about the homes, "Except for disproportionately high liability costs, these would be very successful facilities – with occupancy during the first quarter of this year averaging 90 percent. They are well managed and staffed by dedicated caregivers, and can be very attractive facilities under a legal and operating structure different than what is practicable as part of the Beverly organization."

4.13     Beverly, Fillmore, Rubin Schron and the Beverly Executives intend to mold the surviving company post-merger into this different "legal and operating structure" in order to avoid responsibility for Beverly wrongdoings and deny Norma Louise Ramsey, other Beverly residents and their visitors the ability to obtain compensation for personal injuries.

4.14     As further evidence of Beverly's intent, Beverly has engaged in stall and delay tactics. As was reported in Plaintiff's Motion for Injunctive relief in *Martha Tedder, Individually and as Administrator of the Estate of Lawrence Keasler, Deceased, and on Behalf of the Wrongful Death Beneficiaries of Lawrence Keasler vs. Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc., and Beverly Enterprises – Arkansas, Inc. d/b/a Beverly Healthcare – Paragould*, No. CIV-2205-215(B), Greene County Circuit Court. Beverly repeatedly moves to continue trial dates as a delay tactic. In one previous case, *Laveta Wills-Hale, As Personal Representative of the Estate of Lonnie Dean Will, Deceased vs.*

*Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc., and Beverly Enterprises – Arkansas, Inc. d/b/a Countrywood Estates*, No. CV2002-99-2, Drew County Circuit Court, Beverly moved to continue that case three times, and then moved again to continue the case after it ultimate trail setting of March 20, 2006. Beverly also moved to continue another case, *Mattie Points vs. Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc. and Beverly Enterprises – Arkansas, Inc. d/b/a Beverly Healthcare – El Dorado*, No. CV2005-0128-6, Union County Circuit Court, and only withdrew its Motion after Plaintiff filed a Motion for injunctive relief. In *Martha Tedder, Individually and as Administrator of the Estate of Lawrence Keasler, Deceased, and on Behalf of the Wrongful Death Beneficiaries of Lawrence Keasler vs. Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc., and Beverly Enterprises – Arkansas, Inc. d/b/a Beverly Healthcare – Paragould*, No. CIV-2205-215(B), Greene County Circuit Court, Beverly vehemently denied that its repeated continuance motions constituted delay tactics and asked for a trial setting in the first three months of 2006. Then when the Plaintiff joined in Beverly's request, Beverly asserted its counsel would not be available to try the case until later in the year. Plaintiffs assert that Beverly wants all trial dates moved as far past the closing of its merger with Fillmore as possible.

4.15    Beverly also reported to attorneys that once the merger closes, sufficient funds to pay claims may not be available (Affidavit of Jeffrey Pitman, Ex. A) filed in *Valerie Keaton, Individually and as Administrator of the Estate of Herman Johnson, deceased and on Behalf of the Wrongful Death Beneficiaries of Herman B. Johnson v. Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc. and Beverly Enterprises – Arkansas, Inc.*

22

*d/b/a Beverly Healthcare – Camden*,  No. CV-2005-282-6 in the Circuit Court of Ouachita County, Arkansas.

4.16    According to Beverly's public filings with the S.E.C., the company is self-insured for general and professional liabilities up to a self-insurance limit. The limit differs depending on the policy years. From 2003 forward, the amount is $2 million per claim with no aggregate stop-loss coverage. Only after Beverly has paid $2 million on this claim, is insurance available.

4.17    Beverly Indemnity, LTD was a captive insurance company organized under the laws of Vermont. Beverly Indemnity paid Beverly's self-insurance limit on each professional liability claim as those claims become due.

4.18    Pamela Daniels testified via deposition on November 11, 2005, in two cases: *Laveta Wills-Hale, As Personal Representative of the Estate of Lonnie Dean Will, Deceased vs. Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc., and Beverly Enterprises – Arkansas, Inc. d/b/a Countrywood Estates*, No. CV2002-99-2, Drew County Circuit Court and *Mattie Points vs. Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc. and Beverly Enterprises – Arkansas, Inc. d/b/a Beverly Healthcare – El Dorado*, No. CV2005-0128-6, Union County Circuit Court.  She state that there is a funding schedule for Beverly's captive insurance company, Beverly Indemnity, LTD. Beverly funds the account of time as liabilities come due. According to Ms. Daniels, funds that are restricted in this indemnity account may only be used for payment of certain claims. However, the rest of the funds in the indemnity account are not restricted. Ms. Daniels testified that once Beverly's merger closes, all funds and the entire indemnity account transfer to the buyer. Ms. Daniels spoke of NASC as buyer, and the NASC merger agreement was assigned to the Fillmore Buyer.

23

4.19    Since Beverly's merger with Fillmore, there is a substantial risk that the Beverly Indemnity fund will no longer be funded and/or unrestricted funds will be removed from the Beverly Indemnity account. As a result, no funds will be available to pay the claims of the Estate of Norma Louise Ramsey, of other similarly situated residents of facilities of Beverly Defendants, or their visitors.

## FRAUDULENT TRANSFERS

4.20    BEI'S Board of Directors approved a merger agreement dated August 16, 2005, as amended as of August 23, 2005, September 22, 2005, November 20, 2005 and December 20, 2005, by and among BEI, PSC, PSC Sub, and GPH. The merger agreement provides for the acquisition of BEI by PSC for $12.50 per share in cash, without interest. Following the completion of the merger, PSC will own all of BEI's issued and outstanding capital stock.

4.21    PSC will require approximately $2.29 billion in order to complete the transactions contemplated by the merger agreement. The $2.29 billion requirement consists of payment of approximately $1.6 billion as the purchase price for the shares of common stock and stock options, the repayment or refinancing of approximately $431 million of indebtedness of BEI, the payment of $41 million related to the prepayment of debt and the payment of approximately $220 million in severance costs, transaction fees and other expenses.

4.22    PSC has informed BEI that it will raise the $2.29 billion required pursuant to loan commitments from Column Financial, Inc. and CapitalSource Finance LLC and an equity contribution by Fillmore Investors. PSC and GPH have received a mortgage loan commitment letter, dated November 18, 2005, from Column Financial in the aggregate amount of $1.325 billion for the financing of the transactions contemplated by the merger agreement. PSC and

GPH have also received loan commitment letters dated November 18, 2005, for the financing of the transactions contemplated by the merger agreement from CapitalSource for various facilities totaling an aggregate of $550 million.

4.23    Fillmore Investors has delivered an equity commitment letter to PSC.  Under the equity commitment letter, Fillmore Strategic Investors has agreed to make an equity contribution to PSC or GPH in the aggregate amount of $350 million.

4.24    In sum, the merger agreement constitutes a LBO of BEI.  An LBO refers to the acquisition of a company ("target corporation") in which a substantial portion of the purchase price paid for the stock of the target corporation is borrowed and where the loan is secured by the target corporation's assets. The acquirer of Beverly will invest little or no equity in Beverly.

4.25    The effect of this LBO is that Beverly's shareholders will be replaced by secured creditors. The level of risk facing the new company post-merger will rise significantly due to the increased debt to equity ratio. This added risk will be borne primarily by the unsecured creditors – those who will most likely not be paid in the event of insolvency.

4.26    The LBO of Beverly by the Fillmore group constitutes a fraudulent transfer under the Uniform Fraudulent Transfer Act (UFTA).  See Ark. Code Ann. §§ 4-59-201 to 213.

4.27    Plaintiffs have a claim against a Beverly nursing home in West Memphis for the injuries Norma Louise Ramsey suffered from substandard care at Beverly's West Memphis facility; that claim is a pending lawsuit, ***Walter Dwayne Ramsey, Administrator Of The Estate of Norma Louise Ramsey, Deceased, Walter Dwayne Ramsey, Wanda Grace Ramsey, and Joyce Ann Westfall, vs. Beverly Enterprises, Inc., and Beverly Enterprises - Arkansas, Inc.***, No. CV 2006-350, Crittenden County Circuit Court. Plaintiffs are therefore "creditors" entitled to the protections afforded by the UFTA. The UFTA defines a "creditor" as any person who has

a "claim" and broadly defines "claim" to include a right to payment "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Ark. Code Ann. § 4-59-201(3) and (4).

4.28    BEI is a "debtor" under the UFTA as it is a legal entity liable for Plaintiffs's claim." Ark. Code Ann § 4-59-201(6) and Ark. Code Ann. §4-59-201(9).

4.29    The LBO of BEI constitutes a "transfer" under the UFTA. The UFTA defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, creation of a lien or other encumbrance." Ark. Code Ann. § 4-59-201(12). The LBO of BEI will be financed by granting security interests in virtually all of Beverly's assets and make those assets unavailable for the payment of patient care claims.

4.30    Norma Louis Ramsey suffered injuries at a Beverly nursing home and has a patient care claim for which Beverly is responsible for paying its self-insured retention limit of $2 million before insurance coverage is available.

4.31    BEI will not receive reasonably equivalent value in exchange for the debt incurred to consummate the merger and secured by BEI's assets. BEI will receive no benefit from the encumbering of its assets. Rather, the cash generated by encumbering BEI's assets will primarily be used to fund the purchase of all of BEI's stock and to make approximately $130 million in severance payments to approximately 44 executive officers and managerial employees.

4.32    BEI has not received and will not receive reasonable equivalent value in exchange for severance payments to William Floyd and the other executives named as Defendants. The total value of Floyd's severance package is approximately $43 million; for Douglas Babb, $11.8

26

million; for David Devereaux, $10.3 million; for Jeffrey Freimark, $10.1 million; for Cindy Susienka, $9.7 million; for Patrice Acosta, $2.3 million; for James M. Griffith, $4.5 million; for Patricia Kolling, $1 million; for Richard Skelly, Jr., $1.5 million. These amounts are grossly excessive.

4.33    The financial structure of LBO of BEI evidences actual intent to avoid payment of individuals with patient care claims or against BEI, and specifically Norma Louise Ramsey in this case. See Ark. Code Ann. § 4-59-204(a)(1). Upon information and belief, the post-merger entities will be structures such that the entity liable to Norma Louise Ramsey and others with patient care claims or visitor injury claims will have no assets with which could be used to satisfy a judgment. All of BEI's assets will either be fully encumbered or owned by a separate entity from whom Norma Louise Ramsey and other persons with patient care claims or visitor injury claims will be unable to collect any judgment.

4.34    The financial structure of the LBO will leave BEI insolvent, unable to pay its debts as they come due and/or with unreasonably small assets such that it is reasonably foreseeable that it will fail. See Ex. B, Affidavit of Bruce Engstrom, filed in *Valerie Keaton, Individually and as Administrator of the Estate of Herman Johnson, deceased and on Behalf of the Wrongful Death Beneficiaries of Herman B. Johnson v. Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc. and Beverly Enterprises – Arkansas, Inc. d/b/a Beverly Healthcare – Camden*, No. CV-2005-282-6 in the Circuit Court of Ouachita County, Arkansas which is hereby incorporated by reference. See Ark. Code Ann. § 4-59-204(a)(2) and 205(a).

4.35    Upon information and belief, William Floyd and the other executive Defendants (including Schron) have actual or constructive knowledge that the intent of the LBO is to avoid

27

payment to individuals with patient care claims and visitor injury claims against BEI, and specifically Norma Louise Ramsey in this case, and that the LBO will leave BEI insolvent, unable to pay its debts as they come due and/or with unreasonably small assets such that it is reasonably foreseeable that it will fail. Based on their experience in the nursing home industry and knowledge of the Mariner LBO, the executive Defendants (including Schron) know or should know that the debt burden placed on BEI by the LBO will cause it to fail; that Norma Louise Ramsey and other persons with patient care claims and visitor injury claims will be unsecured creditors; and that the LBO will leave BEI with no assets that may liquidated to pay unsecured creditors. Despite this knowledge, the executive Defendants have chosen to enrich themselves with exorbitant sums for which the company and shareholders receive no value.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Walter Dwayne Ramsey, Administrator of the Estate of Norma Louise Ramsey, Deceased, Walter Dwayne Ramsey, Wanda Grace Ramsey, and Joyce Ann Westfall pray for judgment jointly and severally against Defendants as follows:

1.     For damages caused by Defendants's violation of the Uniform Fraudulent Transfer Act, Ark. Code. Ann. §4-59-201 *et seq.* in an amount adequate to compensate Plaintiffs for the injuries and damages sustained and plus costs and all other relief to which Plaintiffs are entitled by law;

2.     For all general and special damages caused by the alleged conduct of Defendants in violating Ark. Code Ann. §4-59-201 *et seq.* in an amount to be determined by a jury, plus court costs and all other relief to which Plaintiffs are entitled by law;

3.     For the costs of litigating this case;

28

4.      For punitive damages against all Defendants for intentional, egregious, and malicious misconduct in intentional and reckless disregard and conscious indifference as to the consequences to Plaintiffs;

5.      For attorneys's fees pursuant to Ark. Code Ann. §§ 4-88-113(f) and 4-88-204;

6.      That the Court fashion an adequate and equitable remedy for Plaintiffs as against those separate Defendants in the form of constructive trust over sufficient amounts of money from any and all of the named Defendants so that Beverly will be able to satisfy its self-insured retention in this matter, or if Beverly is uninsured for this claim, in an amount to satisfy Plaintiffs's claim in its entirety; or in the alternative require Beverly to post an adequate bond with this Court such that Beverly can satisfy its self-insured retention in this matter or satisfy Plaintiffs's claim *__Walter Dwayne Ramsey, Administrator Of The Estate of Norma Louise Ramsey, Deceased, et al vs. Beverly Enterprises, Inc., et al__*, No. CV 2006-350, Crittenden County Circuit Court.;

7.      For an Order of the Court imposing a judgment lien against the assets of the Defendants to the extent of any judgment rendered for the Plaintiffs in *__Walter Dwayne Ramsey, Administrator Of The Estate of Norma Louise Ramsey, Deceased, et al vs. Beverly Enterprises, Inc., et al__*, No. CV 2006-350, Crittenden County Circuit Court and allowing Plaintiffs to levy execution on the assets transferred to the Defendants and on their proceeds;

8.      For an Order appointing a receiver to take charge of assets transferred to the Defendants or of other property of the transferees;

9.      For an injunction against further dispositions by the Defendants or a transfer of the assets transferred or of other property;

10.     For general relief or all other and further relief appropriate under the circumstances;

11.     For the certification of a class action and an order compelling Defendants to bear the expense of notifying the class and for similar relief for each member of the class or the class as a whole.

**THIS IS THE FIRST APPLICATION FOR INJUNCTIVE RELIEF IN THIS CAUSE.**

**DUNCAN E. RAGSDALE,**
Tennessee Disciplinary Number: 4934
Attorney for the Plaintiffs
1415 Madison Avenue
Memphis, Tennessee 38104
(901) 523-2927

**GERALD A. COLEMAN**
Arkansas Disciplinary No. 82034
Attorney for the Plaintiffs
105 N. Avalon
West Memphis, Arkansas 72301
(870) 735-3735